# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 14, 2018          Decided August 13, 2019

No. 18-5156

HAMED SUFYAN OTHMAN ALMAQRAMI, ET AL.,
APPELLANTS

v.

MICHAEL R. POMPEO, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF STATE AND JOHN DOES, #1-#50, IN THEIR
OFFICIAL CAPACITY AS THE CONSULAR OFFICIALS RESPONSIBLE
FOR ISSUING DIVERSITY VISAS,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-01533)

———

*Benjamin M. Eidelson* argued the cause for appellants. With him on the briefs were *Matthew E. Price*, *Max J. Minzner*, *Yolanda Rondon*, *Arthur B. Spitzer*, and *Scott Michelman*.

*Scott G. Stewart*, Attorney, U.S. Department of Justice, argued the cause for appellees. On the brief were *Gisela A. Westwater* and *Erez Reuveni*, Assistant Directors, and *Joshua S. Press*, Trial Attorney.

Before: TATEL and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Plaintiffs were offered the chance to apply for a select number of "diversity visas." The government never granted them visas, and the statutory deadline to do so has now passed. But this case is not moot because whether the district court retains the authority to award plaintiffs relief is a merits question. We reverse the district court's decision to the contrary.

I

A

In general, a citizen of a foreign country who wishes to come to the United States must first obtain a U.S. visa, which is placed in the traveler's passport. A visa does not guarantee entry into the United States; it only confers the right to travel to a port of entry and apply for admission to enter the country. 8 U.S.C. § 1201(h). Failure to satisfy certain requirements in the Immigration and Nationality Act (INA) will render an alien ineligible for a visa *and* ineligible for entry. For example, an alien cannot receive a visa if she has "a communicable disease of public health significance," and if she contracts such a disease after receiving her visa, she will be denied entry. 8 U.S.C. § 1182(a)(1)(A). Other parts of the INA apply to only visas *or* entry. The Secretary of State may, for instance, decline to issue a visa to an alien who abused a position of power to expropriate American property, *id.* § 1182d, and the Attorney General may decide that certain aliens must pay bonds before entering the country, *id.* § 1183.

Each fiscal year, the State Department grants approximately 50,000 diversity immigrant visas to individuals

from countries underrepresented in the immigration process, which allow recipients who are granted admission to enter the country as lawful permanent residents who may live and work here indefinitely. *See* 8 U.S.C. §§ 1151(e), 1153(c)(1); Pls.' Br. 4 & n.1.[1] The process by which the State Department awards diversity visas is competitive and complicated. An applicant must first apply for and win the diversity visa "lottery." Pls.' Br. 5; *see* 8 U.S.C. § 1153(e); 22 C.F.R. § 42.33(b)-(c). A lottery winner or "selectee" must submit an application and various documents to be eligible for a visa number—an administrative device used by the State Department to ensure that it does not grant more than 50,000 visas per year. Gov't Br. 9-10; *see* 8 U.S.C. § 1202(b); 22 C.F.R. §§ 42.33(f)-(g), 42.61-67. A selectee is eligible to receive a visa number only during the fiscal year in which he applied and was selected ("selection FY"). 8 U.S.C. § 1153(e)(2); 22 C.F.R. § 42.33(f). Visa number in hand, the selectee may schedule a consular interview, and if he meets the criteria to obtain one, the State Department "shall" issue him a diversity visa. 8 U.S.C. § 1153(c), (e)(1); 22 C.F.R. §§ 40.6, 42.81(a); *see* 8 U.S.C. § 1202(h). Consulates return unused visa numbers to the State Department at the end of each month so that they may be reassigned, but the State Department stops granting visa numbers altogether once it projects that it will issue all available visas to existing visa number holders. Gov't Br. 9-10. Because the diversity visa program restarts each fiscal year, consular officers may not issue diversity visas after midnight on September 30 of the selection FY. 8 U.S.C.

---

[1] A diversity visa applicant who is already living in the United States in another legal status would instead apply to U.S. Citizenship and Immigration Services (USCIS) for adjustment of status. If successful, he receives a lawful permanent resident identification card. There is no need to satisfy the entry requirements. We use the term "diversity visas" to describe both processes.

§§ 1153(c)(1), 1154(a)(1)(I)(ii)(II); 22 C.F.R. § 42.33(a)(1), (d); *see* 31 U.S.C. § 1102.

B

In March 2017, President Trump invoked his authority under 8 U.S.C. § 1182(f) to "suspend the entry of all aliens or any class of aliens as . . . he may deem to be appropriate" and issued the second iteration of his "travel ban"—an Executive Order that temporarily prohibited nationals of specific countries from entering the United States, subject to exemptions and waivers. Exec. Order No. 13,780 ("EO-2"), *Protecting the Nation From Foreign Terrorist Entry Into the United States* §§ 2(c), 3(c), 12(e), 82 Fed. Reg. 13,209, 13,213-15, 13,218 (2017); *see Trump v. Hawaii*, 138 S. Ct. 2392, 2437 (2018). Several district courts issued preliminary injunctions preventing the government from enforcing EO-2's entry restriction, which were largely affirmed by the courts of appeals. *See Hawaii*, 138 S. Ct. at 2437. But in June 2017, the Supreme Court held that EO-2's entry restriction could take effect while the Court considered the appeals of the preliminary injunctions, except as to foreign nationals with "a credible claim of a bona fide relationship with a person or entity in the United States." *Trump v. Int'l Refugee Assistance Project* (*IRAP I*), 137 S. Ct. 2080, 2088 (2017) (per curiam).

Two days after the Supreme Court's ruling, the State Department issued a "Guidance Memo" instructing consular officers reviewing diversity visa applications about how EO-2's entry ban affected visa eligibility: A consular officer should first determine whether the selectee "is eligible for the [visa], without regard to [EO-2]." J.A. 17. If so, and if he is from a country subject to EO-2, the officer must evaluate whether the selectee qualifies for an exemption or waiver, or can establish

a bona fide relationship with the United States. If he cannot, his visa will be refused.

C

Plaintiffs won the 2017 diversity visa lottery but were denied visas pursuant to the Guidance Memo. Consular officers interviewed plaintiffs and, in accordance with the Memo, determined that they would have been eligible for diversity visas but for the issuance of EO-2. However, because plaintiffs were from Iran and Yemen—countries subject to the entry ban—and could not qualify for exemptions or waivers or satisfy *IRAP I*'s bona fide relationship requirement, the consular officers determined that plaintiffs were "not exempt from [EO-2's] suspension of entry" and denied them visas. *See* J.A. 17.

Plaintiffs filed suit in the U.S. District Court for the District of Columbia in August 2017. The amended complaint alleges that the Guidance Memo directed consular officers to make visa determinations on the basis of nationality in violation of 8 U.S.C. § 1152(a)(1)(A). It further alleges that § 1182(f) only authorized the President to restrict *entry*, so by relying on EO-2 to deny plaintiffs *visas*, consular officers violated their duty under the INA to issue visas to all statutorily eligible applicants. Among other relief, plaintiffs asked the district court to "enjoin[] the State Department from implementing the policy set forth in [the Guidance Memo]" and order "consular officers to process [p]laintiffs' applications pursuant to the [INA]." *P.K. v. Tillerson*, 302 F. Supp. 3d 1, 6 (D.D.C. 2017).

The next month, the State Department informed the district court that it was on track to issue all 50,000 visas allocated for FY 2017 prior to October 1 and would no longer process

additional requests for visa numbers made during FY 2017. The government argued that this development "counsel[ed] against" an order that it give plaintiffs visa numbers or process their applications. J.A. 33-34. Plaintiffs presented the district court with several options. From past practice, it appeared that the State Department would not reallocate visa numbers returned in September. Instead of "wast[ing]" those numbers, plaintiffs suggested that the court could order the government to reassign them to plaintiffs. J.A. 46. Recognizing that the district court might have reservations about issuing such a ruling while the Supreme Court was reviewing the orders enjoining EO-2's entry restriction as unlawful, plaintiffs explained that the district court could instead "maintain the status quo" by ordering the State Department to "reserve any unused visa numbers until" *IRAP I* was "resolved." *Id.*

On September 24, 2017, EO-2 expired and was replaced by the third iteration of President Trump's travel ban, the "Proclamation." Proclamation No. 9,645, *Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats*, 82 Fed. Reg. 45,161 (2017); *see P.K.*, 302 F. Supp. 3d at 3-4. Although the Proclamation modified the scope and duration of EO-2's entry restrictions, the restrictions on Iranians and Yemenis remained largely the same.

Five days later, on September 29—one day before the end of FY 2017—the district court issued its first ruling. Plaintiffs had argued that the litigation over EO-2's *entry* restrictions was "irrelevant" to their case about *visas*, J.A. 46, but the district court concluded otherwise. Relying on language equating visas and entry in the courts of appeals decisions affirming the injunctions of EO-2 and the nature of the relief sought in those cases, the district court determined that the Supreme Court's order staying challenges to EO-2's *entry* ban also necessarily

stayed challenges to EO-2's effect on *visas*. *P.K.*, 302 F. Supp. 3d at 7-8 & n.7. But in the midst of the uncertainty about the strength and status of the legal challenges before the Supreme Court, and with only one day before the end of plaintiffs' selection FY, the district court sought to preserve the status quo and thus keep alive the possibility that plaintiffs could yet receive their visas. The court therefore ordered the State Department to report the number of unused visa numbers for FY 2017 and "hold those visa numbers to process [p]laintiffs' visa applications in the event the Supreme Court finds [EO-2] to be unlawful." J.A. 112 ("September 29 Order"). The government has since advised that 27,241 diversity visa numbers were returned unused and that it issued 49,976 diversity visas in FY 2017—24 shy of the statutory target. This appeal primarily concerns whether the district court may order the government to keep those unused visas available in the event these plaintiffs eventually prevail on their claims.

In October 2017, the Supreme Court explained that challenges to the expired entry restrictions of EO-2 were moot. *Trump v. Hawaii*, 138 S. Ct. 377, 377 (2017); *Trump v. IRAP*, 138 S. Ct. 353, 353 (2017). That same month, the government filed a motion to dismiss this case as moot, arguing that once FY 2017 ended, the court lacked the power to order the government to issue plaintiffs FY 2017 diversity visas. The district court rejected that theory, but agreed that the case was moot because the Guidance Memo was issued to implement the now-expired EO-2 and the September 29 Order had "expressly predicated" any future order requiring the government to process plaintiffs' applications upon "the Supreme Court find[ing] [EO-2] to be unlawful," which it had not done. *Almaqrami v. Tillerson*, 304 F. Supp. 3d 1, 7-8 (D.D.C. 2018) (first alteration in original) (internal quotation marks omitted). Plaintiffs appeal.

While this litigation was ongoing, other plaintiffs challenged the Proclamation's entry ban on grounds similar to those argued to enjoin EO-2. Once again, district courts enjoined that ban, and the courts of appeals affirmed. In June 2018, the Supreme Court held that those plaintiffs were not likely to show that the Proclamation was unlawful. *Hawaii*, 138 S. Ct. 2392.

## II

We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review is de novo, though we accept as true the facts plaintiffs have alleged. *Schnitzer v. Harvey*, 389 F.3d 200, 202 (D.C. Cir. 2004).

A federal court's jurisdiction is limited to "Cases or Controversies." U.S. Const. art. III, § 2, cl. 1. A lawsuit becomes moot—and is therefore no longer a "Case" or "Controversy"—"when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). But a case becomes moot only if, assuming the plaintiff prevails, "it is impossible for a court to grant [her] any effectual relief whatever." *Id.* (quoting *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 307 (2012)). We must assume that the plaintiff will "prevail" unless her argument that the relief sought is legally available and that she is entitled to it is "so implausible that it is insufficient to preserve jurisdiction." *Id.* at 174. And if there is "any chance" that relief will be effective in securing what she seeks, she has an interest in obtaining it. *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019); *see Chafin*, 568 U.S. at 175-76 ("[T]he fact that a defendant is insolvent does not moot a claim for damages.").

Under this "demanding standard," plaintiffs' claims are not moot. *See Tempnology*, 139 S. Ct. at 1660. They seek a court order instructing the government to stop implementing the Guidance Memo, process their visa applications, and issue them diversity visas. Neither their claim that such relief is legally available nor their claim that they are entitled to that relief is so implausible as to deprive the district court of jurisdiction. And there is some chance that this relief will be effective at securing their immigration to the United States.

A

The parties dispute whether the district court may lawfully take steps to grant plaintiffs relief, notwithstanding the fact that FY 2017 is over. This question goes to the merits, and because plaintiffs' argument that the district court may do so is not "so implausible that it is insufficient to preserve jurisdiction," the case is not moot. *Chafin*, 568 U.S. at 174 (explaining that an argument about "the legal availability of a certain kind of relief" is a merits question).

Courts are often asked to intervene in disputes over diversity visas, and the end of the selection FY does often render those cases moot. In a straightforward case, a plaintiff who believed the government had erroneously denied her visa or was not processing her application quickly enough would file suit well in advance of the end of the selection FY. If the court agreed, it would order the government to correct the error, the government would timely comply, and the plaintiff would receive her visa before the selection FY ended. More often, the plaintiff files suit *after* the selection FY has ended. Because diversity visas expire when the selection FY ends, 8 U.S.C. §§ 1153(c)(1), 1154(a)(1)(I)(ii)(II), that plaintiff does not have a statutory right to the requested visa and the government does not have a duty to issue her one. Courts faced with this situation

have dismissed these lawsuits as moot. *Zixiang Li v. Kerry*, 710 F.3d 995 (9th Cir. 2013); *Mohamed v. Gonzales*, 436 F.3d 79 (2d Cir. 2006) (per curiam); *Nyaga v. Ashcroft*, 323 F.3d 906 (11th Cir. 2003) (per curiam). *But see Coraggioso v. Ashcroft*, 355 F.3d 730 (3d Cir. 2004) (dismissing suit on the merits); *Iddir v. INS*, 301 F.3d 492 (7th Cir. 2002) (same).

Sometimes a plaintiff files suit before the selection FY ends but the court fails to act on that request until after September 30, at which point the State Department lacks authority to issue a diversity visa sought in the prior fiscal year. Courts have likewise dismissed these cases as moot. *See Mwasaru v. Napolitano*, 619 F.3d 545 (6th Cir. 2010); *Zapata v. INS*, 93 F. Supp. 2d 355 (S.D.N.Y. 2000).

Other cases involve a different twist. The plaintiff files suit and the court grants *some* relief—but not the visa—before October 1. In such a case, after the selection FY has ended, the court might lawfully take steps to compel the government to process the plaintiff's application and issue her a diversity visa anyway.

That is what happened here. On September 29, the district court ordered the government to reserve unused FY 2017 visa numbers so that, if it turned out that plaintiffs had erroneously been denied their diversity visas, the court could order the government "to process visas [for plaintiffs] past the statutory deadline." *P.K.*, 302 F. Supp. 3d at 10-11. The district court cited two cases in which courts had done something similar: *Przhebelskaya v. USCIS*, 338 F. Supp. 2d 399 (E.D.N.Y. 2004) and *Paunescu v. INS*, 76 F. Supp. 2d 896 (N.D. Ill. 1999). In both, before the selection FY ended, the district court ordered the government to timely process plaintiffs' diversity visa applications. Had the government complied, plaintiffs would have received visas. But the government did not, so the court

invoked its equitable power to enforce prior orders and instructed the government to issue the plaintiffs visas even though the selection FY had ended. *See also Marcetic v. INS*, No. 97 C 7018, 1998 WL 173129, at *2 (N.D. Ill. Apr. 6, 1998) (ordering government to comply with prior order entered by an immigration judge requiring it to do what was necessary to issue plaintiff's green card).

The question is whether, now that the selection FY has ended, the district court can order the State Department to do anything with the unused visa numbers held in reserve pursuant to the September 29 Order. Following *Chafin*, we hold that this is a merits question in the context of this case. There, a father sought a court order directing the mother of his daughter to return the child to the United States after taking her to live overseas. *Chafin*, 568 U.S. at 173. The mother argued that the father did not have a legally cognizable interest in obtaining that order because the court "lack[ed] the authority to issue" it "pursuant to its inherent equitable powers." *Id.* at 174. But that argument—"which goes to the . . . legal availability of a certain kind of relief—confuse[d] mootness with the merits." *Id.* Because the husband's claim that the district court possessed the equitable power to issue such an order was not "so implausible that it is insufficient to preserve jurisdiction," the court had to assume that claim would prevail, meaning the case was not moot. *Id.*

It is likewise not "implausible" that the district court here could rely on equity to take steps to compel the issuance of diversity visas, notwithstanding the end of FY 2017. Indeed, the government acknowledges that courts have that power, but in its view, that power is limited to cases like *Przhebelskaya* and *Paunescu* in which the court orders the government to *process* a visa application. By contrast, the district court here ordered the government to hold available visa numbers to

*potentially process* plaintiffs' applications. Because there is no "prior court order that was not complied with," Gov't Br. 37, the court cannot even "*arguabl[y]*" invoke equity to provide plaintiffs relief, *id.* at 31, or so the argument goes, *see id.* at 28-37.

This argument assigns more determinacy to the meaning of the September 29 Order than it can bear, in our view, for purposes of our mootness analysis. That Order instructed the government to "hold [unused] visa numbers to process [p]laintiffs' visa applications in the event the Supreme Court finds [EO-2] to be unlawful." J.A. 112. We hold that the September 29 Order need not be read to limit the authority of the district court to grant additional relief to a scenario in which the Supreme Court finds EO-2 unlawful.[2] Rather, it is at least possible to read that Order as doing one or both of two other things.

First, the Order might simply have preserved the "status quo . . . while the legality of [EO-2]" was pending before the Supreme Court, meaning it preserved the district court's ability, as of September 29, to rectify the erroneous denial of plaintiffs' visas based on a legally questionable Guidance Memo or erroneous interpretation of the INA. *See P.K.*, 302 F. Supp. 3d at 7. Second, it may have told the government that *if* one specific eventuality arose—the Supreme Court found EO-2 unlawful—the State Department must process plaintiffs' visa

---

[2] In the district court's view, that is all it did, and because the Supreme Court never found EO-2 unlawful, the district court concluded that it could not grant plaintiffs further relief. *Almaqrami*, 304 F. Supp. 3d at 8. Although the government does not defend this reasoning on appeal, and plaintiffs argue this was not "an independent alternative holding," Pls.' Br. 24, we are obligated to address potential jurisdictional defects, *Floyd v. District of Columbia*, 129 F.3d 152, 155 (D.C. Cir. 1997).

applications. These readings may be combined. That is, the Order could be read as (1) instructing the State Department to "hold" these unused visa numbers for the purpose of enabling a later judicial judgment, which might require the government "to process" plaintiffs' applications after any salient obstacles were removed, and (2) identifying the specific judgment that would issue if the Supreme Court took a certain action. *Cf. Crystal Clear Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 415 F.3d 1171, 1177-78 (10th Cir. 2005) (concluding from context that an order stating plaintiffs must submit "claims" to the FCC only intended to refer some claims, but not others, to the FCC); *Gjertsen v. Bd. of Election Comm'rs of City of Chi.*, 751 F.2d 199 (7th Cir. 1984) (Posner, J.) (context and district court's intent demonstrated that an order styled as a "final judgment" was actually an order granting a preliminary injunction).

On that reading, the September 29 Order left open whether a later judgment would issue and, if so, what it would look like in the event the Supreme Court took any of myriad other tacks—for example, holding that the President could rely on § 1182(f) to restrict entry but not visas, that the *IRAP I* plaintiffs lacked standing, that their claims were nonjusticiable, or that the case must be dismissed as moot, which the district court knew was a possibility on September 29. *See P.K.*, 302 F. Supp. 3d at 4 n.4 (explaining that the Court had vacated oral argument in *IRAP I* and ordered the parties to brief whether the Proclamation and expiration of EO-2 mooted that case). We need not decide the merit of these various readings; we merely note that they are possible constructions of the September 29 Order.

That means plaintiffs' claim that further relief is legally available is not "so implausible" as to be "insufficient to preserve jurisdiction." *Chafin*, 568 U.S. at 174. For example, if we were to read the Order as leaving open the possibility that a

later judgment would issue, now that *IRAP I*—the primary obstacle the district court identified to granting plaintiffs additional relief—has been dismissed as moot, it is not "implausible" that the district court could grant plaintiffs additional relief. As the district court explained, if it "were to now order the State Department to use the unused visa numbers to process [p]laintiffs' visa applications, it would [arguably] be requiring the State Department to fulfill its obligations under" the September 29 Order, which instructed the State Department to "reserve the unused visa numbers . . . for a specific purpose: the future processing of [p]laintiffs' visa applications." *Almaqrami*, 304 F. Supp. 3d at 6. Like in *Paunescu* and *Przhebelskaya*, such an order would give effect to the district court's prior directive, entered before the end of the selection FY, to preserve an essential (and otherwise expiring) ingredient of relief. To be sure, those cases required the government to comply with a prior order to *process* applications, *see* Gov't Br. 37, but they offer useful examples, not binding models, and neither of those courts limited their holdings to the precise scenario they confronted, *see Almaqrami*, 304 F. Supp. 3d at 7. And this case is more similar to *Paunescu* and *Przhebelskaya* than the cases dismissed as moot because the plaintiff filed too late or the court did not act in time. All told, this is enough to suggest that plaintiffs' argument that the district court could grant them additional relief, despite the end of the selection FY, is not so "completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974)).

## B

Three other issues warrant brief discussion. First, the district court concluded that because the expiration of EO-2 rendered challenges to that order moot, the same was true for

plaintiffs' challenges to the Guidance Memo that implemented EO-2, and therefore "this case" was moot. *Almaqrami*, 304 F. Supp. 3d at 8. But plaintiffs asked the district court to declare the policy in the Guidance Memo unlawful and enjoin the State Department from implementing it *and* to order consular officers to process their visa applications in accordance with the INA. *See P.K.*, 302 F. Supp. 3d at 7. If the Guidance Memo is no longer in force, that arguably removes an obstacle to the plaintiffs' ability to obtain an order instructing the government to process their applications and issue them visas pursuant to the INA separate and apart from anything provided in the Memo. As for their challenges to the Memo itself, although courts generally cannot declare unlawful or enjoin policies that are no longer in force, the district court never actually found that the Guidance Memo "expired by its own terms" along with EO-2. *See Almaqrami*, 304 F. Supp. 3d at 7 (quoting *IRAP*, 138 S. Ct. at 353; and citing *Hawaii*, 138 S. Ct. at 377). Indeed, the present record suggests that the Memo did not. *See* Tr. of Oral Arg. at 5:10-12 (plaintiffs' counsel explaining without contradiction that "there is nothing in the record suggesting that" the Guidance Memo or the policy it announced "was ever rescinded or modified"). Without making such a finding, the district court was too quick to conclude that plaintiffs' challenges to the Memo were moot. *Compare Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 627 n.5 (2018) ("Because the [challenged rule] remains on the books for now, the parties retain 'a concrete interest' in the outcome of this litigation, and it is not 'impossible for a court to grant any effectual relief . . . to the prevailing party.'" (quoting *Chafin*, 568 U.S. at 172)), *with Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1288 (D.C. Cir. 2016) ("expiration of a government policy ordinarily moots a challenge to it"). *See also Rembert v. Sheahan*, 62 F.3d 937, 938 (7th Cir. 1995) (declining to address mootness in the face of an insufficient record).

Furthermore, whether the Memo has expired has no effect on the potential viability of plaintiffs' theories of relief, which we must assume are valid unless they are "wholly insubstantial and frivolous." *Steel Co.*, 523 U.S. at 89 (quoting *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)). EO-2 prevented nationals of specific countries from *entering* the United States; it said nothing about diversity visas. Although "aliens who are inadmissible" to the United States for reasons described in certain provisions of the INA "are ineligible to receive visas," 8 U.S.C. § 1182(a), plaintiffs argue that § 1182(f), which the President relied on to issue EO-2 and the Proclamation, is not one of those designated provisions. Plaintiffs also argue that by denying them visas on the basis of nationality, the State Department and its consular officers violated 8 U.S.C. § 1152(a)(1)(A). They admit that some language in the Supreme Court's *Hawaii* opinion "is in tension with [their] claim[s]," but they contend that language is neither binding nor persuasive, and that other language in *Hawaii* is "profoundly helpful." Tr. of Oral Arg. at 6:14-17; *see id.* at 7:10-9:2, 23:17-25:20. We take no position on the merits of these arguments, or whether plaintiffs have "state[d] a claim to relief that is plausible on its face," as required by Federal Rule of Civil Procedure 12(b)(6). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). We merely note that they are sufficient to preserve the district court's subject matter jurisdiction. *See Chafin*, 568 U.S. at 174; *Steel Co.*, 523 U.S. at 89.

Finally, because there is some chance that this relief would be effective at securing plaintiffs' immigration to the United States, their "suit remains live." *Tempnology*, 139 S. Ct. at 1660; *see Chafin*, 568 U.S. at 172, 174-75 (explaining that, unless it is impossible to grant relief that would be effective in securing the plaintiff's goal, the case is not moot). Although the Proclamation currently prevents nationals of Iran and Yemen from entering the country, plaintiffs could qualify for

an exemption or waiver. Or the President might lift these particular entry restrictions, as he has done for nationals of Chad. Proclamation No. 9,723, *Maintaining Enhanced Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats*, 83 Fed. Reg. 15,937, 15,938-39 (2018); *see also Hawaii*, 138 S. Ct. at 2422 (explaining other changes made since the initial entry restrictions took effect). These possibilities "may be uncertain or even unlikely," *Tempnology*, 139 S. Ct. at 1660, but that "does not typically render cases moot," *Chafin*, 568 at 175; *see Del. Riverkeeper Network v. FERC*, 857 F.3d 388, 397 (D.C. Cir. 2017) (case was not moot even though the court's order "would almost certainly have no real world consequences"). This case is no different.

## III

On the present record, this case is not moot. We reverse the order dismissing this case for lack of subject matter jurisdiction and remand it to the district court for further proceedings.[3]

---

[3] The government also moved to dismiss plaintiffs' amended complaint as nonjusticiable based on the doctrine of consular nonreviewability and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Mem. of Supporting Points and Authorities at 26-31, 34-39, No. 17-cv-01533 (D.D.C. Oct. 20, 2017), Dkt. No. 53-1. The district court had already rejected the government's consular nonreviewability argument. *P.K.*, 302 F. Supp. 3d at 11-12. Because the court dismissed the case as moot, it did not reconsider that consular nonreviewability determination or reach the government's 12(b)(6) argument. *Almaqrami*, 304 F. Supp. 3d at 9 & n.3.

When we reverse the dismissal of a case as moot, our usual practice is to remand for the district court to consider arguments

*So ordered.*

---

about the merits in the first instance, assuming no other threshold issues exist. *E.g.*, *Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 956 (D.C. Cir. 2016). Because courts "may assume without deciding that plaintiffs' statutory claims are reviewable" and proceed to the merits "notwithstanding consular nonreviewability," we see no need to address consular nonreviewability here. *Hawaii*, 138 S. Ct. at 2407; *see* Gov't Br. 38-43 (not arguing this doctrine is jurisdictional).