# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 9, 2020          Decided June 30, 2020

No. 18-3055

UNITED STATES OF AMERICA,
APPELLANT

v.

DAVID G. BOWSER,
APPELLEE

Consolidated with 18-3062, 19-3037

Appeals from the United States District Court
for the District of Columbia
(No. 1:16-cr-00059-1)

*Leslie McAdoo Gordon* argued the cause and filed the briefs for appellant/cross-appellee.

*James Pearce*, Attorney, U.S. Department of Justice, argued the cause for appellee/cross-appellant. With him on the briefs was *Todd W. Gee*, Deputy Chief. *Elizabeth Trosman*, Assistant U.S. Attorney, entered an appearance.

Before: HENDERSON, GRIFFITH, and WILKINS, *Circuit Judges*.

2

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: A jury convicted David G. Bowser of charges that he obstructed an investigation by the Office of Congressional Ethics into his work as chief of staff to a Member of Congress. In this appeal, we affirm the jury's verdict and the post-trial rulings of the district court from all challenges by Bowser and the Government.

I

A

The evidence at trial established the following. Bowser began working as the chief of staff for Paul Broun, a Member of the House of Representatives from Georgia, in January 2009. Representative Broun first joined Congress after winning a special election in 2007, and he was easily re-elected in 2008 and 2010.

In January 2012, Bowser was confident that Representative Broun would again retain his seat after the primary and general elections later that year. But even winning politicians have flaws, and Representative Broun's was—according to Bowser—that he struggled with "messaging." Trial Tr. 32:16 (Mar. 15, 2018), J.A. 573. So in February 2012, just as Representative Broun's office was gearing up for another election, Bowser sought to hire a "messaging consultant" to help the Congressman "develop as a better communicator." J.A. 672. Brett O'Donnell was a seasoned consultant with experience preparing President George W. Bush and Senator John McCain for presidential debates. On June 14, Bowser announced to the Congressman's office that O'Donnell would join "Team Broun as a communications and messaging consultant to our official office." J.A. 807.

Despite Bowser's explanation that the new hire would help only with official duties, O'Donnell soon found himself working on the Congressman's re-election campaign. In fact, on the same day that Bowser hired O'Donnell, he asked him to assist with the Congressman's debate preparation. Just a week later, O'Donnell prepared Representative Broun for yet another debate. This shift in duties surprised O'Donnell. He testified at trial that he felt like Bowser pulled a "bait and switch" by retaining him "to do work for the official side" and then asking him to perform campaign functions. Trial Tr. 52:13-20 (Mar. 1, 2018), J.A. 294.

O'Donnell's campaign duties soon decreased. In July 2012, the Congressman won the Republican primary, and he faced no serious opposition in the general election. But in early 2013, an incumbent Senator from Georgia announced his retirement, and Representative Broun decided to seek the vacant seat. O'Donnell once again found himself saddled with campaign duties. He helped prepare the Congressman for eight Republican primary debates and several campaign-related speeches and interviews. O'Donnell testified at trial that, in early 2013, he "was doing 60 percent official work, 40 percent campaign work"; by the end of 2013, he performed "easily 80 percent campaign work, 20 percent official work." Trial Tr. 101:19-22 (Mar. 5, 2018), J.A. 320.

Nothing prevented O'Donnell from assisting the campaign as a volunteer or campaign employee, but House Rules forbade the Congressman's office from paying O'Donnell out of the "Members' Representational Allowance" (MRA). The MRA provides funds "to support the conduct of the official and representational duties of a Member of the House of Representatives," 2 U.S.C. § 5341(a); *see also* IDA A. BRUDNICK, CONG. RESEARCH SERV., R40962, MEMBERS'

REPRESENTATIONAL ALLOWANCE: HISTORY AND USAGE (2019), and the funds may not pay for campaign expenses. Between June 2012 and March 2014, O'Donnell was paid over $40,000 from the Congressman's MRA funds. With one minor exception not relevant here, O'Donnell was paid only with MRA funds.

This possible misuse of congressional funds soon attracted media scrutiny. In March 2014, a reporter asked Representative Broun whether O'Donnell had been paid with taxpayer money to provide debate coaching. The Congressman allegedly slammed the door in the reporter's face, and a local news outlet published a story with the descriptive title, "Congressman Slams Door on Channel 2 Reporter When Asked About Campaign Coach." Because of this press report, O'Donnell was fired. He testified that Bowser informed him that "things [had] just gotten too hot with this story, that it would do damage to the campaign." Trial Tr. 55:24-25, 56:1 (Mar. 5, 2018), J.A. 333-34. O'Donnell also testified that, during the same conversation, Bowser told him for the first time that he had been only a "*volunteer* with the campaign." *Id.* at 56:16-24, J.A. 334 (emphasis added). On March 25, Bowser emailed the staff in the office to announce that Representative Broun "reluctantly accepted [O'Donnell's] resignation." J.A. 823.

This media attention also spurred an inquiry from the Office of Congressional Ethics (OCE or the "Office"). The OCE is "an independent office" within the House that reports to the House Committee on Ethics and investigates possible misconduct by Members of Congress or their employees. H.R. Res. 895, 110th Cong. § 1(a) (2008); *see* JACOB R. STRAUS, CONG. RESEARCH SERV., R40760, HOUSE OFFICE OF CONGRESSIONAL ETHICS: HISTORY, AUTHORITY, AND PROCEDURES (2019). The Speaker of the House and the House Minority Leader each appoint three private citizens to serve on

the Board, *see* H.R. Res. 895, 110th Cong. § 1(b) (2008), and the OCE hires additional staff to conduct its day-to-day business, *see id.* § 1(h). The Office may receive allegations of possible misconduct "from any source," including news reports and submissions from the public. Trial Tr. 60:9-19 (Mar. 8, 2018), J.A. 458. And when two Board members authorize a "preliminary review," the Office's staff must review the allegations and make a recommendation to the Board. If the Board concludes that misconduct occurred, it may "recommend[]" that the investigated matter "requires further review" by the Ethics Committee itself. H.R. Res. 895, 110th Cong. § 1(c)(2)(B) (2008).

On April 1, 2014, OCE began such a preliminary review, informing Representative Broun that if he "misused funds from his [MRA]" to pay O'Donnell then "he may have violated House rules and federal law." J.A. 679. Bowser promptly emailed O'Donnell to reiterate his view that any assistance on the campaign was *voluntary*; he had been *paid* for only official work. "We hired you," Bowser wrote, "in an official capacity to help the Congressman improve his speaking abilities." J.A. 824. "Any debate advice you wanted to give him on your own time, outside the official compound, has no bearing on the fact that we hired you to work in an official capacity . . . ." *Id.*

In June, the Office issued a series of "Requests for Information" (RFIs) to the Congressman's staff, asking for "[a]ll files, records, notes, communications, and any other documents relating to Brett O'Donnell." J.A. 683. Bowser's interference continued. For instance, one staffer testified that he believed that Bowser instructed him to falsely certify that he "didn't have any information relevant" to the review. Trial Tr. 67:10 (Mar. 12, 2018), J.A. 501. Another testified that—on Bowser's instructions—she withheld campaign-related emails that she had exchanged with O'Donnell, Trial Tr. 83-85 (Mar.

7, 2018), J.A. 401-03, including some from her official account that "looked bad for the office," *id.* at 86:4, J.A. 404.

Bowser also received his own RFI, and although Bowser turned over emails from his official email account, he never disclosed any emails that he exchanged with O'Donnell on his personal account. Bowser also misled investigators about his reasons for hiring O'Donnell. During his OCE interview, for instance, he claimed that "at no point did we ever entertain the idea that this would be a political adventure. This was purely on the official side." J.A. 701.

The Office's review ended on June 25, 2014, and the Board recommended that the Ethics Committee investigate misconduct in Representative Broun's office. But the committee took no disciplinary action against the Congressman. Representative Broun lost the Senate primary and left office in January 2015, placing him beyond the committee's jurisdiction.

B

Though the Office's review never culminated in disciplinary action against the former Congressman, it spawned this criminal prosecution against his chief of staff. On April 6, 2016, a grand jury charged Bowser with obstruction of Congress (Count One), *see* 18 U.S.C. § 1505; theft of government funds (Count Two), *see id.* § 641; concealment of material facts from the OCE (Count Three), *see id.* § 1001(a)(1); and five counts of making false statements to the OCE (Counts Four through Eight), *see id.* § 1001(a)(2).

The case proceeded to trial. After the Government presented its case-in-chief, Bowser filed a motion for judgments of acquittal on Counts One through Seven. The

district court reserved ruling on this motion, proceeded with the trial, then submitted the case to the jury. *See* FED. R. CRIM. P. 29(b). The jury convicted Bowser of obstructing Congress, concealing material facts from OCE, and making three false statements. The jury acquitted Bowser of two of the false-statement charges. The jury also indicated that it was "hopelessly deadlocked" on the theft charge, and the district court declared a mistrial on that count. J.A. 105.

The district court then considered Bowser's motion for judgments of acquittal. At the Government's request, the district court dismissed the theft charge with prejudice. Next, the district court granted Bowser's motion for acquittal on the obstruction-of-Congress charge, reasoning that § 1505 does not "protect the OCE's investigatory power." J.A. 103. Finally, the district court denied the motion for judgments of acquittal on the concealment conviction and his false-statement convictions.

This appeal followed. The Government challenges the district court's decision to grant a judgment of acquittal on the obstruction-of-Congress charge. Bowser challenges his concealment conviction, two of the false-statement convictions, and the district court's decision to dismiss the theft charge with prejudice instead of granting a judgment of acquittal. Last, Bowser claims that, because he should have been acquitted on some of these counts, "spillover prejudice" requires us to vacate his convictions on the false-statement charges. We reject both parties' arguments and affirm.

II

We begin with the Government's appeal of the district court's order granting a judgment of acquittal on Bowser's obstruction-of-Congress charge. *See* 18 U.S.C. § 1505. That

statute criminalizes the obstruction of "any inquiry or investigation [that] is being had by either House, or any committee of either House or any joint committee of the Congress." *Id.* The Government concedes that the Office is neither a "House," nor a "committee," nor a "joint committee." Gov't Br. 49, 53 n.16. Instead, the Government emphasizes that the statute extends to any investigations "*being had by*" the House, which covers the Office's investigations because "the House itself initiated [them] through creating the OCE in the first place." *Id.* at 48.

We disagree. Section 1505's specific reference to "either House," "any committee," and "any joint committee" implies that Congress meant to exclude other bodies within the Legislative Branch. *See Taylor v. FAA*, 895 F.3d 56, 65 (D.C. Cir. 2018) ("[T]he expression of one thing implies the exclusion of others."). Indeed, the statute's failure to include other congressional "offices" is especially strong evidence of meaning here because other statutes do. For instance, the False Statements Act applies to "any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission *or office of the Congress*." 18 U.S.C. § 1001(c)(2) (emphasis added); *see also* 18 U.S.C. § 202(e)(3) (defining the "legislative branch" to include both "the Congress" and "any other . . . *office* . . . established in the legislative branch" (emphasis added)). Congress knows how to refer to legislative offices when it chooses, and we must give effect to the statute's tailored language.

Attempting to side-step this textual argument, the Government urges that the Office's reviews are investigations "being had by" the House or the Ethics Committee *itself* because the Office functions as their "agent." Gov't Br. 51-53 (citing *United States v. Senffner*, 280 F.3d 755, 760 (7th Cir. 2002) ("[W]henever an entity acting for or at the direct request

of an agency has been obstructed, the agency itself has also been obstructed.")). The argument fails. First, the Government's agency theory creates surplusage; if § 1505 were interpreted to criminalize obstruction of Congress's "agents," then the statute's inclusion of "committees" and "joint committees" would do little or no work. Moreover, the House Rules themselves establish that the Office's review process is not yet an investigation by the House or the Ethics Committee. The Office possesses only the limited power to recommend that the allegations "require[] further review" by the Ethics Committee, H.R. Res. 895, 110th Cong. § 1(c)(2)(B) (2008), and the committee may "undertake an investigation" "*upon receipt of a report*" from the OCE. Rules of the House of Representatives, 116th Cong., Rule XI.3(b)(2) (2019) (emphasis added). If the Ethics Committee "undertake[s] an investigation" only after it receives the Office's report, then the process of creating that report cannot be an investigation "being had by" the House or its committee.

We need not decide whether or in precisely what circumstances a legislative office might work so closely with the House or a committee that the investigation is "being had by" an institution listed within § 1505. *See Senffner*, 280 F.3d at 760. We hold only that—in these circumstances—the House has structured its internal procedures such that the Office's reviews precede any investigation by the House or the Ethics Committee. If Congress wishes to extend liability to those who obstruct the work of the Office, it may do so, and it has model language for such an amendment in the False Statements Act. *See* 18 U.S.C. § 1001(c)(2). We thus affirm the judgment of acquittal on the obstruction-of-Congress charge.

III

We next consider Bowser's challenges to his convictions.

10

A

First, Bowser argues that the district court should have granted his motion for a judgment of acquittal on the concealment charge. *See* 18 U.S.C. § 1001(a)(1), (c)(2). Of relevance here, that statute makes it unlawful to "conceal[] . . . a material fact" during "any investigation or review" by an "office of the Congress." *Id.* To secure a conviction, the Government must establish a "duty to disclose material facts on the basis of specific requirements for disclosure of specific information." *United States v. Safavian*, 528 F.3d 957, 964 (D.C. Cir. 2008). Bowser asserts that he had no such duty to disclose because "OCE's review was an entirely voluntary process," and "there [was] no statute, regulation, or form that imposed on [him] a specific requirement to disclose particular information." Bowser Br. 47.

We disagree. Bowser does not dispute that he failed to produce emails from his personal account between himself and O'Donnell. He also conceded at oral argument that a government "form" can impose a duty to disclose. Oral Arg. Tr. 32:24-25; *see also Safavian*, 528 F.3d at 965 n.7; *United States v. Calhoon*, 97 F.3d 518, 526 (11th Cir. 1996). Here, the form that Bowser received—the Request for Information—identified the "specific information" that the Office sought, all communications with O'Donnell. That form also advised Bowser that he would need to "certify" that he "provided all [responsive] documents," and that this certification would be "subject to the provisions of the Federal False Statements Act, 18 U.S.C. § 1001." J.A. 835. Later, he signed two documents certifying that he had fully complied with the RFI and acknowledging that 18 U.S.C. § 1001 applied to his disclosure of information. J.A. 837, 839. Altogether, Bowser affirmed that he fully complied with a request for specific information that

was issued during a duly authorized ethics inquiry. These facts establish a duty to disclose.

Bowser's efforts to compare his case to *Safavian* fail. In that case, the defendant—David Safavian—was an employee of the General Services Administration (GSA). *Safavian*, 528 F.3d at 959. One of Safavian's friends conducted some business before GSA, and that friend invited Safavian to travel to Scotland on a chartered plane for a five-day golfing trip. *Id.* Safavian sought "an ethics opinion from GSA's general counsel about whether he could accept the air transportation as a gift," but he never disclosed that the friend conducted business before the GSA. *Id.* at 960, 962. Later, GSA's Inspector General opened an investigation into the trip; Safavian agreed to be interviewed, but he again failed to disclose that his friend conducted business before GSA. *Id.* at 961. A jury convicted Safavian of two counts of concealment— one for withholding information when he requested the ethics opinion, the other for his incomplete answers to the Inspector General. *Id.* at 962-63.

We reversed, reasoning that § 1001(a)(1) requires the Government to establish "a duty to disclose material facts on the basis of *specific* requirements for disclosure of *specific* information." *Id.* at 964 (emphasis added). In *Safavian*, the Government asserted two insufficient bases for this duty. First, it pointed to what we characterized as "vague standards of conduct for government employees," such as an instruction to refrain from "us[ing] public office for private gain." *Id.* at 964 (internal quotation marks omitted). Second, the Government argued that "once one begins speaking when seeking government action or in response to questioning, one must disclose all relevant facts." *Id.* at 965. But neither of these sources triggered a duty to disclose because neither gave "fair

notice of what conduct [was] forbidden." *Id.* at 964 (internal quotation marks omitted).

Unlike the defendant in *Safavian*, Bowser did have "fair notice" that he could be criminally prosecuted. The RFI identified the specific information sought and informed him of possible criminal liability under § 1001 if he withheld it. Bowser seems to think that a voluntary process like an ethics inquiry can never create a duty to disclose, but that stretches *Safavian* too far. Section 1001 extends to "*any* investigation or review" by an "office of the Congress," 18 U.S.C. § 1001(c)(2) (emphasis added), and that language easily encompasses the OCE's voluntary ethics investigations—so long as the investigator gives "fair notice." Because the form distributed to and signed by Bowser satisfies this requirement, we affirm the concealment conviction.

B

Bowser next argues that the district court should have granted judgments of acquittal on two of the false-statement charges, Counts Four and Seven. *See* 18 US.C. § 1001(a)(1). Count Four charged Bowser with making a false statement when he told the OCE investigators, "At no point did we ever entertain the idea that this [O'Donnell's services] would be a political adventure. *This was purely on the official side*." Indictment ¶ 86, J.A. 67 (emphasis added). And likewise in Count Seven: "I mean, bottom line is this was done because [Representative Broun] significantly needed help in his communicating ability and that's the only reason why it was done and, you know, *we had no intention at all of doing anything on the political side with this*." *Id.* ¶ 92, J.A. 70 (emphasis added). Bowser raises three challenges to these convictions, but none is persuasive.

1

Bowser claims that his false-statement convictions are nonjusticiable under *United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995). There, we noted that the Constitution's Rulemaking Clause authorizes each House of Congress to "determine the Rules of its Proceedings," U.S. CONST. art. I, § 5, and we reasoned that "judicial interpretation of an ambiguous House Rule runs the risk of the court intruding into the sphere of influence reserved to the legislative branch under the Constitution." *Rostenkowski*, 59 F.3d at 1306. Under *Rostenkowski*, then, a charge may be nonjusticiable if it compels the jury to interpret an "ambiguous" House Rule.

Bowser says that his false-statement convictions must be dismissed under *Rostenkowski*. He notes that the House Rules authorize Congressmen to use MRA funds for "primarily official duties that are not campaign related." J.A. 199-201. Bowser suggests that the false-statement charges invited the jury to interpret the House Rules by determining Bowser's "primary purpose" in hiring O'Donnell. Bowser Br. 50-51.

Bowser's *Rostenkowski* argument fails. As discussed, the Government alleged that Bowser falsely stated that he expected O'Donnell to perform *only* official work—not campaign work. *E.g.*, Indictment ¶ 86, J.A. 67 ("This was purely on the official side."). That allegation does not implicate the House Rules at all. The Rules concern whether O'Donnell could be *compensated* with congressional funds; the allegations supporting the false-statement charges concern only *what kind of work* Bowser anticipated that O'Donnell would perform. Accordingly, the jury could convict Bowser of making these false statements without interpreting the House Rules, and so the charges were justiciable.

14

2

Bowser argues that the jury lacked sufficient evidence to conclude that his statements to the OCE investigators were false. We owe "tremendous deference" to the jury's verdict, *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990), and Bowser's conviction must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002) (internal quotation marks omitted).

The standard of review presents an insurmountable hurdle for Bowser. As the district court noted, a "voluminous record" supports the jury's verdict that Bowser always intended for O'Donnell to perform campaign work. J.A. 122. For instance, Bowser conducted O'Donnell's interview in the offices of the National Republican Campaign Committee, a venue where Republican Congressmen perform campaign activities that would be impermissible in congressional office buildings. Perhaps most tellingly, just *two hours* after Bowser officially hired O'Donnell, Bowser asked O'Donnell to assist with debate preparation. And O'Donnell testified that—just a month after he had been hired—he felt like Bowser had pulled a "bait and switch" by "retaining [him] to do work for the official side" and then asking him to perform campaign functions. Trial Tr. 52:13-20 (Mar. 1, 2018), J.A. 294.

Bowser offers an alternative interpretation. He suggests that Representative Broun "had no need for campaign assistance" when Bowser first hired O'Donnell because the Congressman faced only "token opposition" in the 2012 election. Bowser Br. 55-56. But the jury is entitled to "draw a vast range of reasonable inferences," *Long*, 905 F.2d at 1576, and a rational factfinder could infer that Bowser always

15

expected to enlist O'Donnell on the campaign, regardless of its competitiveness. We decline to overturn the jury's verdict.

3

Finally, Bowser challenges the jury instructions. The district court instructed the jury that the statement must have been "false, fictitious, or fraudulent"—an instruction that precisely tracks the statute's language. J.A. 627; 18 U.S.C. § 1001(a)(2). Bowser claims that the jury should've been instructed that Bowser's statements "were false under any reasonable interpretation of them." Bowser Br. 58. Bowser relies exclusively on the out-of-circuit decision in *United States v. Migliaccio*, 34 F.3d 1517 (10th Cir. 1994), but he fails to explain—and we fail to see—that decision's relevance here. We thus decline to adopt Bowser's proposed jury instruction.

C

After the jury deadlocked on the theft charge, the district court dismissed the charge with prejudice. *See* FED. R. CRIM. P. 48(a). Unsatisfied with that result, Bowser argues that he "should have been *acquitted* at the close of the Government's case." Bowser Br. 34 (emphasis added). Bowser again relies on *Rostenkowski*, arguing that the theft charge "asked the jury to invade the legislative province" by "interpret[ing] internal rules adopted by the House to govern its own Members." *Id.* at 38-39.

The Government responds that this claim is moot, *see* Gov't Br. 23-25, and we must first address this threshold jurisdictional issue. Bowser's claim becomes moot only if "it is impossible for a court to grant any effectual relief whatever." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (internal quotation

marks omitted); *see also Almaqrami v. Pompeo*, 933 F.3d 774, 779 (D.C. Cir. 2019).

Bowser contends that the case remains live "because he has a right to clear his good name." Bowser Reply 8. The "dismissal did not exonerate him," Bowser says, so he is entitled to seek the judgment of acquittal, which would amount to a ruling that he "was in fact innocent." *Id.* We disagree. Bowser's *Rostenkowski* argument entitles him—at most—to a dismissal of the allegations against him because they lie beyond a federal court's authority to adjudicate. A favorable ruling under *Rostenkowski* would not announce his innocence; instead, it would announce that trying the theft charge risks judicial intrusion "into the sphere of influence reserved to the legislative branch." *Rostenkowski*, 59 F.3d at 1306. Because Bowser's argument under *Rostenkowski* would not entitle him to the declaration of innocence that he seeks, we cannot redress this alleged reputational harm.

Bowser next claims that "he was prejudiced with respect to the other charges by [the theft charge's] existence." Bowser Reply 9. When addressing mootness, we must assume the success of his argument on the merits. *Almaqrami*, 933 F.3d at 779. And if Bowser were correct, we could redress *that* harm by vacating for another trial on the *other* charges. *See United States v. Rooney*, 37 F.3d 847, 855 (2d Cir. 1994). This potential remedy keeps Bowser's claim alive—but barely. We do not think that Bowser really did suffer prejudice from the district court's refusal to acquit him before submitting the theft charge to the jury. Again, the Government presented overwhelming evidence that Bowser withheld information from and lied to the Office—the factual bases for his remaining convictions. We thus cannot see the theft charge's "substantial and injurious effect or influence in determining the jury's verdict." *United States v. Baugham*, 449 F.3d 167, 174 (D.C.

Cir. 2006) (internal quotation marks omitted). Because any error was harmless, we need not address the merits of Bowser's *Rostenkowski* argument.

## D

Finally, Bowser claims that we must reverse three of his false-statement convictions because of a "prejudicial spillover of evidence" from allowing the jury to consider the theft, obstruction, and concealment charges. Bowser Br. 59 (citing *Rooney*, 37 F.3d at 855); *cf. United States v. Mathis*, 216 F.3d 18, 25 (D.C. Cir. 2000) (discussing the possibility of prejudicial error "when multiple defendants are charged with a large and complex conspiracy and spillover prejudice confuses the jurors"). He faults the district court because the jury "should have been instructed to disregard the evidence" relating to these counts. Bowser Br. 61. But as we've explained, overwhelming evidence supports the jury's verdict on the false-statement charges. *Rooney*, 37 F.3d at 855-56 (considering the "strength of the government's case on the counts in question" when assessing spillover prejudice). Thus, any failure to instruct the jury to ignore evidence presented for other counts was harmless, and we decline to vacate Bowser's convictions. *See Baugham*, 449 F.3d at 174.

## IV

We affirm the judgment of the district court.

*So ordered.*